## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

THE TRUMP ORGANIZATION
LLC and DTTM OPERATIONS
LLC,

    *Plaintiffs*,

    v.

THE INDIVIDUALS,
CORPORATIONS,
LIMITED LIABILITY
COMPANIES,
PARTNERSHIPS, and
UNINCORPORATED
ASSOCIATIONS
IDENTIFIED ON
SCHEDULE A,

    *Defendants*.

**Case No. 8:25-cv-1962-TPB-AAS**

**Preliminary Injunctive
Relief Requested**

_____/

## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

Defendants run a counterfeiting operation with disregard for anything except generating profits. In doing so, they promote, advertise, market, distribute, offer for sale, sell, and/or import counterfeit products in connection with Plaintiffs' federally registered trademarks ("Counterfeit Products"), through various fully interactive, commercial internet websites operating under at least the online marketplace accounts in Schedule A (the "Defendant Internet Stores").

Defendants create numerous Defendant Internet Stores that appear to sell genuine products but sell unauthorized and unlicensed Counterfeit Products to unknowing consumers. The Defendant Internet Stores share unique identifiers, such as design elements and similarities of the counterfeit products offered for sale. These identifiers establish a logical relationship between the Defendant Internet Stores and suggest that Defendants' counterfeiting operation arises out of the same transaction, occurrence, or series of transactions or occurrences. Defendants attempt to avoid liability by concealing their identities and the full scope and interworking of their counterfeiting operation.

On August 1, 2025, this Court granted Plaintiffs' *ex parte* Motion for Temporary Restraining Order and entered the Temporary Restraining Order ("TRO"), (Doc. 17), (1) temporarily restraining Defendants' continued manufacture, importation, advertisement, promotion, offering for sale, sale, distribution, and transfer of Counterfeit Products; (2) temporarily restraining Defendants' assets to preserve Plaintiffs' right to an equitable accounting; and (3) authorizing expedited discovery allowing Plaintiffs to inspect and copy Defendants' records relating to Defendants' infringement and Defendants' financial accounts.[1]

---

[1] Plaintiffs filed a motion to authorize service by electronic publication, which was granted on August 4, 2025, (Doc. 20), and approved within the TRO. *See* TRO, p. 10, ¶ 10.

The legal standards for granting a temporary restraining order and preliminary injunction are the same. So Plaintiffs are filing this Motion on the same basis, relying on the same evidence and allegations previously submitted to support the granting of Plaintiffs' *ex parte* Motion for Temporary Restraining Order ("Motion for TRO"), (Doc. 14).[2] Plaintiffs respectfully request under 15 U.S.C. § 1116, Fed. R. Civ. P. 65, and The All Writs Act, 28 U.S.C § 1651(a), that this Court issue a preliminary injunction against Defendants and an order restraining the financial accounts they use prior to or upon the expiration of the Court's previously entered TRO. Without that relief, Defendants' unlawful activity will continue and Plaintiffs and consumers will suffer irreparable harm.

Given the covert nature of offshore counterfeiting activities and the vital need to establish an economic disincentive for infringement, courts regularly issue such orders in similar circumstances.[3] This Court should do the same.

---

[2] Though previously filed, in compliance with Middle District of Florida Local Rule 6.02(a)(2), Plaintiffs' relied-upon papers for the foregoing Motion are re-attached here: **Exhibit 1**, Plaintiffs' Complaint (Doc. 1); **Exhibit 2**, true and correct copies of the certificates of registration for Plaintiffs' trademarks (Doc. 1-1); **Exhibit 3**, Plaintiffs' Schedule A (Doc. 12); **Exhibit 4**, the Declaration of Alan Garten in Support of Plaintiffs' *ex parte* Motion for TRO ("Garten Decl.") (Doc. 14-1); **Exhibit 5**, exemplary screenshots of Defendants' Counterfeit Products offered for sale to the Middle District of Florida on the Defendant Internet Stores and proof of orders actually placed and accepted (Doc. 15); and **Exhibit 6**, the Court's TRO (Doc. 17).

[3] *See, e.g.*, *The North Face Apparel Corp., et al. v. The Individuals, Corporations, Limited Liability Companies, Partnerships, and Unincorporated Associations Identified on Schedule A*, No.: 0:22-cv-60193, ECF No. 11 (S.D. Fla. Jan. 27, 2022) (granting orders requested here in similar case); *Louis Vuitton Malletier v. The Individuals, Business Entities,*

## BACKGROUND

### I.    Plaintiffs' Intellectual Property and Products

The Trump Organization, Plaintiffs' corporate office, is responsible for the enforcement of the federally registered trademarks owned by DTTM Operations LLC—including those for the mark "TRUMP"—which are covered by U.S. Trademark Registration Nos. 4,276,258, 4,332,755, 5,080,397, and 7,758,981 (the "TRUMP Trademarks" or "Plaintiffs' Trademarks").    The registrations are valid, subsisting, and in full force and effect.  True and correct copies of the certificates of registration for the TRUMP Trademarks were attached as Exhibit 1 to the Garten Decl., ¶ 4–5, and are re-attached here as Exhibit 2.

The Trump Organization is a privately held, U.S.-based conglomerate with interests in a wide range of sectors—including various consumer products, real-estate development, hospitality, golf, entertainment, and digital-blockchain based assets.  For the last forty-plus years, the Trump Organization has licensed rights to its intellectual property—including the TRUMP Trademarks—to various third parties for the sale of numerous products that incorporate the TRUMP Trademarks.  Garten Decl., ¶ 8.  From the date of the creation of the first TRUMP Products to the present, the Trump

*and Unincorporated Associations identified on Schedule A*, No. 0:22-cv-60192, ECF No. 9 (S.D. Fla. Jan. 28, 2022) (same).

Organization and its authorized licensees have been the sole and official source for genuine TRUMP Products in the United States and Florida. *Id.*, ¶ 9. Plaintiffs' promotional efforts for the TRUMP Products include—by way of example but not limitation—substantial marketing and advertising on the internet, such as through the Trump Organization's official website (www.trump.com), the Trump Organization's official online store (www.trumpstore.com), and through television, radio, and other media platforms. *Id.* The TRUMP Trademarks are and have been the subject of substantial and continuous marketing and promotion by Plaintiffs. Plaintiffs have and continue to widely market and promote the TRUMP Trademarks in the industry and to consumers. *Id.*, ¶ 6. Plaintiffs also have expended substantial time, money, and other resources in developing, advertising, and otherwise promoting the TRUMP Trademarks. Garten Decl., ¶ 10. As a result, products bearing the TRUMP Trademarks have become enormously popular around the world, driven by Plaintiffs' arduous quality standards and innovative trademarked designs. *Id.* These designs are exclusively associated by consumers, the public, and the trade as being products sourced from Plaintiffs. *Id.*

## II.  Defendants' Unlawful and Deceptive Activities

Plaintiffs have identified numerous fully interactive, commercial-internet stores operating under the Defendant Internet Stores and/or the

online-marketplace accounts identified in Schedule A to the Complaint that are selling Counterfeit Products using the TRUMP Trademarks—from East Asia to consumers in this District. Garten Decl., ¶¶ 12–16. *See also* Complaint, ¶ 38. Defendants typically facilitate sales by designing the Defendant Internet Stores so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers selling genuine TRUMP products. *Id.*, ¶ 18. Many of the Defendant Internet Stores look sophisticated and accept payment in U.S. dollars via credit cards and PayPal. *Id.*, ¶ 19. The Defendant Internet Stores often include images and design elements that make it difficult for consumers to distinguish counterfeit sites from an authorized website. *Id.* Plaintiffs have not licensed or authorized Defendants to use the TRUMP Trademarks, and none of the Defendants is an authorized retailer of genuine TRUMP products. *Id.*, ¶ 17.

Defendants also typically deceive unknowing consumers by using the TRUMP Trademarks without authorization within the content, text, and/or meta tags of their websites to attract various search engines crawling the internet looking for websites relevant to consumer searches for TRUMP Products. Garten Decl., ¶ 20. Further, Defendants go to great lengths to conceal their identities and often use multiple fictitious names and addresses to register and operate their network of Defendant Internet Stores. *Id.*, ¶ 21. For example, many of Defendants' names and physical addresses used to

register the Defendant Internet Stores are incomplete or contain randomly typed letters. *Id.* Defendants regularly create new websites and online marketplace accounts on various platforms using the identities listed in Schedule A to the Complaint, as well as other unknown fictitious names and addresses. *See* Complaint, ¶ 31. Defendants use these common tactics to conceal the full scope of their counterfeiting operation, and to avoid being shut down. *Id.*

Despite operating under multiple fictitious names, there are numerous similarities among the Defendant Internet Stores. Garten Decl., ¶ 22. For example, many of the Defendant websites have virtually identical layouts. *Id.* In addition, Counterfeit Products for sale in the Defendant Internet Stores bear similar irregularities and indicia of being counterfeit, suggesting that the Counterfeit Products originate from a common source and that, upon information and belief, Defendants are interrelated. *Id.* The Defendant Internet Stores also include other notable common features, including use of the same seller name registration patterns, unique shopping cart platforms, accepted payment methods, check-out methods, meta data, lack of contact information, and/or using the same text and images. *Id.*

### LEGAL STANDARD

The standards for granting a temporary restraining order and a preliminary injunction are identical. *See Emerging Vision, Inc. v.*

*Glachman*, 2010 WL 3293346, at *3 (S.D. Fla. June 29, 2010) (citing *Schiavo ex rel. Schindler v. Schiavo,* 403 F.3d 1223, 1225–26 (11th Cir. 2005); *Siegel v. LePore*, 120 F. Supp. 2d 1041 (S.D. Fla. 2000) *aff'd*, 234 F.3d 1163 (11th Cir. 2000) (en banc)).  To obtain a temporary restraining order or a preliminary injunction, a party must establish "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." *Schiavo*, 403 F.3d at 1225–26 (11th Cir. 2005); *see also Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (affirming entry of preliminary injunction and freezing of assets).

## ARGUMENT

### I.    Plaintiffs are likely to succeed on the merits of their claims

#### A.    Subject matter and personal jurisdiction exists here

This Court has original subject matter jurisdiction over the trademark infringement and false designation of origin claims here under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, 28 U.S.C. §§ 1338(a)–(b), and 28 U.S.C. § 1331. This Court has jurisdiction over the common-law, unfair-competition claim in this action that arises under the laws of the State of Florida pursuant to 28 U.S.C. § 1367(a) because the state-law claim is so related to the federal claims

that they form part of the same case or controversy and derive from a common nucleus of operative facts.

Personal jurisdiction exists over Defendants in this Judicial District under Fla. Stat. § 48.193(1)(a)(1) and Fla. Stat. § 48.193(1)(a)(6)(a), or in the alternative, Fed. R. Civ. P. 4(k) because the Defendant Internet Stores offer, solicit, and/or accept orders of Counterfeit Products from and offer shipping to Florida consumers located in this Judicial District. Indeed, the Middle District of Florida regularly exercises personal jurisdiction over websites using registered trademarks without authorization in connection with the offering for sale and selling of infringing and counterfeit merchandise to Florida residents over the internet.[4]

As detailed in the Complaint and in the Garten Declaration, Plaintiffs' investigation into Defendants confirms that the Defendant Internet Stores are engaging in interstate commerce and allow for Counterfeit Products to be sold and shipped to addresses in this Judicial District. *See* Garten Decl., ¶¶ 12–16. In fact, Exhibit 2 to the Garten Declaration—re-attached here as Exhibit 5— contains copies of exemplary screenshots from the Defendant Internet Stores

---

[4] *E.g., Ain Jeem, Inc. v. The Individuals, P'hips, and Unincorporated Ass'ns Identified on Schedule A*, Case No. 8:21-cv-01331 (M.D. Fla. Jun 01, 2021) (preliminary injunction order after granting TRO); *Twows, LLC v. The Individuals, Partnerships, and Unincorporated Associations Identified on Schedule A*, Case No. 8:23-cv-00139 (M.D. Fla. Jan 20, 2023) (same).

reflecting their marketing and ability to solicit from and ship Counterfeit Products to the Middle District of Florida along with proof of orders actually placed to, and accepted by many Defendants in, the Middle District of Florida. For that reason alone, this Court can exercise personal jurisdiction over each of Defendants. Finally, venue is proper in this Court under 28 U.S.C. §§ 1391, 1400.

### B. Plaintiffs are likely to succeed on their trademark infringement and counterfeiting claim

A defendant is liable for trademark infringement and counterfeiting under the Lanham Act if it, "without the consent of the registrant, uses in commerce any reproduction, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods ... which such use[s] is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1). To prove a *prima facie* case of infringement, Plaintiffs must show (1) ownership of the trademark at issue; (2) Defendants' use of the trademark is without Plaintiffs' authorization; and (3) Defendants' use is likely to cause confusion, mistake, or deception as to the source, affiliation, or sponsorship of Defendants' goods. *See* 15 U.S.C. § 1114(1). Plaintiffs' evidence submitted here satisfies the three requirements of 15 U.S.C. § 1114.

Satisfying the first two elements, Plaintiffs' TRUMP Trademarks are inherently distinctive and are registered with the U.S.P.T.O. on the Principal Register. All the TRUMP Trademarks have been continuously used even before registration, with at least a portion having been continuously used for over forty-plus years, and Plaintiffs have and continue to widely market and promote the TRUMP Trademarks in the industry and to consumers. Garten Decl., ¶¶ 6, 8. The registrations for the TRUMP Trademarks are valid, subsisting, and in full force and effect. *Id.*, ¶ 5; Exhibit 2. Such registrations constitute *prima facie* evidence of their validity and of Plaintiffs' exclusive right to use the TRUMP Trademarks under 15 U.S.C. § 1057(b). Nor have Plaintiffs licensed to or authorized Defendants to use the TRUMP Trademarks, and none of the Defendants is an authorized retailer of genuine TRUMP products. *Id.*, ¶ 17.

The Eleventh Circuit has enumerated seven factors to determine whether there is a likelihood of confusion. *See Ross Bicycles, Inc. v. Cycles USA, Inc.*, 765 F.2d 1502, 1506 (11th Cir. 1985). These factors, as outlined in *Safeway Store, Inc. v. Safeway Disc. Drugs, Inc.*, are (1) the strength of the mark; (2) the similarity of marks; (3) the similarity of the goods; (4) the similarity of the sales methods; (5) the similarity of advertising media; (6) defendants' intent; and (7) evidence of actual confusion. *See* 675 F.2d 1160, 1164 (11th Cir. 1982); *see also Lipscher v. LRP Publ'ns, Inc.*, 266 F.3d 1305,

1303 (11th Cir. 1997). The seven factors listed are to be weighed and balanced, and no single factor is dispositive. *Id.*

In this case, given their long-standing use and wide acceptance by the public, the TRUMP Trademarks have become famous and associated with high-quality TRUMP Products. The TRUMP Trademarks are distinctive when applied to TRUMP products. The marks signify to consumers that the products come from Plaintiffs and are manufactured to the highest quality standards. Thus, the first factor—the strength of the marks—weighs heavily in favor of Plaintiffs.

As for the second and third likelihood-of-confusion factors, Defendants sell Counterfeit Products using marks identical to or substantially indistinguishable from the TRUMP Trademarks, and in respect of goods identical to those for which the TRUMP Trademarks are registered and incorporated to genuine TRUMP Products. *Compare* Plaintiffs' certificates of registration for the TRUMP Trademarks (attached as Exhibit 2), *with* screenshots of Defendants' Counterfeit Products offered for sale on the Defendant Internet Stores (attached as Exhibit 5).[5] The second and third factors thus weigh heavily in favor of Plaintiffs.

---

[5] *See also Fimab-Finanziaria Maglificio v. Helio Import/Export, Inc.*, 601 F. Supp. 1, 2 (S.D. Fla. 1983) (using "ocular test" of direct comparison and finding marks that are slightly modified from the copied registered marks are still considered counterfeit marks); 15 U.S.C.

Plaintiffs also satisfy the fourth and fifth factors—the similarity of the sales method and advertising media—because convergent marketing channels increase the likelihood of confusion. *See Turner Greenberg Associates, Inc. v. C & C Imports, Inc.*, 320 F. Supp. 2d 1317, 1332 (S.D. Fla. 2004) (citing *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 142 (3d Cir. 1981). For the Defendants that Plaintiffs allege committed trademark infringement, both Plaintiffs and Defendants show the very same product using the TRUMP Trademarks to the same consumers, using at least one of the same marketing channels—the internet—within the same geographical distribution areas within the United States, including the Middle District of Florida. *See, e.g.*, Complaint, ¶¶ 46–50; *compare generally* Complaint, ¶¶ 17–20, *with* Exhibit 5.

As for the sixth factor, when an alleged infringer adopts a mark "with the intent of obtaining benefit from the plaintiffs business reputation, 'this fact alone may be sufficient to justify the inference that there is confusing similarity.'" *Turner Greenberg Assocs.*, 320 F. Supp. 2d at 1333. In this case, Defendants are intentionally using the TRUMP Trademarks to confuse and deceive the consuming public into thinking that Defendants' Counterfeit Products are manufactured by or emanate from Plaintiffs.

§ 1127 (defining "counterfeit" as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark").

Defendants are purposefully attempting to benefit and trade off Plaintiffs' goodwill and reputation. So the sixth factor on Defendants' intent also weighs heavily in Plaintiffs' favor.

As for the seventh and final factor, Plaintiffs need not necessarily show evidence of actual confusion to prevail. *See Frehling Enters. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1340 (11th Cir. 1999) ("[S]uch evidence is not a prerequisite, and thus it is up to individual courts to assess this factor in light of the particular facts of each case"). In this case, actual confusion can be inferred because Defendants are selling Counterfeit Products in connection with the TRUMP Trademarks. *See, e.g.*, Complaint, ¶¶ 46–50; *compare generally* Complaint, ¶¶ 17–20, *with* Exhibit 5. Because the goods are similar and have identical and similar uses, consumers will be confused and think that Defendants' products are genuine TRUMP Products or are sponsored or endorsed by Plaintiffs. Even if buyers are told of the spurious nature of Defendants' goods, other consumers viewing Defendants' goods in a post-sale setting will be confused because they are viewing goods bearing and/or incorporating the TRUMP Trademarks—which creates the impression they are viewing genuine goods sold or authorized by Plaintiffs. Such post-sale confusion is actionable. *See Remcraft Lighting Products, Inc. v. Maxim Lighting, Inc.*, 706 F. Supp. 855, 859 (S.D. Fla. 1989) ("The likelihood of

confusion need not occur at wholesale level when the end user will be confused."). This factor thus weighs in favor of Plaintiffs.

In sum, each of the seven likelihood-of-confusion factors weighs heavily in favor of Plaintiffs, who consequently have a reasonable likelihood of success on the merits for their trademark infringement and counterfeiting claim.

### C. Plaintiffs are likely to succeed on their false designation of origin claim

A plaintiff bringing a false designation of origin claim under 15 U.S.C. § 1125(a) must show that (1) the plaintiff has a valid, protectable trademark; and (2) a likelihood of confusion will exist as to the origin of the plaintiff's products. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 780 (1992). Because the TRUMP Trademarks are registered marks, and Plaintiffs have established a likelihood of success on the merits of their trademark infringement and counterfeiting claim against Defendants—which, as discussed above requires a showing of likelihood of confusion—a likelihood of success on the merits for Plaintiffs' false designation of origin claim has also been established.

### D. Plaintiffs are likely to succeed on their unfair competition claim

Whether Defendants' use of Plaintiffs' Trademarks creates a likelihood of confusion between Plaintiffs' and Defendants' products is also the

determining factor in the analysis of unfair competition under the common law of Florida. *See Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1193 n.4 (11th Cir. 2001) ("Courts may use an analysis of federal infringement claims as a 'measuring stick' in evaluating the merits of state law claims."). As discussed above, Plaintiffs have satisfied the elements of their trademark counterfeiting and infringement claim against Defendants, establishing that a likelihood of confusion exists here. Plaintiffs are thus also likely to succeed on the merits of their corresponding common law claim.

## II. Plaintiffs are suffering irreparable harm and will be further irreparably harmed

The Eleventh Circuit has held that a "sufficiently strong showing of likelihood of confusion [caused by trademark infringement] may by itself constitute a showing of … [a] substantial threat of irreparable harm." *Ferrellgas Partners, L.P. v. Barrow*, 143 F. App'x 180, 191 (11th Cir. 2005). A finding of irreparable injury following a showing of likelihood of confusion is virtually always made in a case such as this, where a plaintiff has demonstrated it will lose control of its reputation as a result of a defendant's activities. *Id.* Defendants' unauthorized use of the TRUMP Trademarks has irreparably harmed, and continues to irreparably harm, Plaintiffs through diminished goodwill and brand confidence, damage to Plaintiffs' reputation, loss of exclusivity, and loss of future sales. *See* Garten Decl., ¶¶ 26–31.

### III.   The equities favor Plaintiffs

If the Court is satisfied Plaintiffs have demonstrated (1) a likelihood of success on the merits, (2) no adequate remedy at law, and (3) the threat of irreparable harm if preliminary relief is not granted, then it must next consider the harm that Defendants will suffer if preliminary relief is granted, balancing such harm against the irreparable harm Plaintiffs will suffer if relief is denied. *TY, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). "When considering the balance of hardships between the parties in infringement cases, courts generally favor the trademark owner." *Krause Int'l Inc. v. Reed Elsevier, Inc.*, 866 F. Supp. 585, 587-88 (D.D.C. 1994). This is because "'[o]ne who adopts the marks of another for similar goods acts at his own peril' since he has no claim to the profits or advantages thereby derived." *Burger King Corp. v. Majeed*, 805 F. Supp. 994, 1006 (S.D. Fla. 1992). So the balance of harms "cannot favor a defendant whose injury results from the knowing infringement of the plaintiff's trademark." *Malarkey-Taylor Assocs., Inc. v. Cellular Telecomms. Indus. Ass'n*, 929 F. Supp. 473, 478 (D.D.C. 1996). As Plaintiffs have shown, Defendants have been profiting from the sale of Counterfeit Products. Equity requires that Defendants cease their unlawful conduct.

## IV. Issuance of the injunction is in the public interest

Defendants are engaged in illegal activities and are directly defrauding the consuming public by palming off Defendants' goods as Plaintiffs' genuine goods. The public has an interest in not being misled as to the origin, source, or sponsorship of trademarked products. *See Nailtiques Cosm. Corp. v. Salon Sciences, Corp.*, 1997 WL 244746, *5, 41 U.S.P.Q.2d 1995, 1999 (S.D. Fla. 1997) ("The interests of the public in not being victimized and misled are important considerations in determining the propriety of granting injunctive relief."). Because "enforcement of the trademark laws prevents consumer confusion," issuance of an injunction enforcing Plaintiffs' Trademarks would prevent such confusion. *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 469 (7th Cir. 2000).

Here, Defendants engage in counterfeiting activities and directly defraud the consuming public by selling Defendants' Counterfeit Products as genuine—causing customer confusion. The public has the right not to be confused and defrauded as to the source of the goods and services offered by Defendants, or as to the identity of the owner of trademarks and service marks used in connection with those goods and services. The injury to the public is significant, and the injunctive relief Plaintiffs seek is specifically intended and needed to remedy that injury by dispelling the public confusion created by Defendants' actions. The public is under the false impression that

Plaintiffs have granted a license or permission to Defendants with respect to the TRUMP Trademarks. Granting Plaintiffs' Motion for Preliminary Injunction is in the public interest.

## V.     The relief sought is appropriate

### a.     The preliminary injunctive relief is appropriate

In addition to this Court's inherent authority to issue injunctive relief, *see Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 987 (11th Cir. 1995), the Lanham Act authorizes courts to issue injunctive relief "according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark." 15 U.S.C. § 1116(a).

Defendants here fraudulently promote, advertise, offer to sell, and/or sell goods in connection with counterfeits of the TRUMP Trademarks via the Defendant Internet Stores. Defendants are creating a false association in the minds of consumers between Defendants and Plaintiffs by deceiving consumers into believing that the Counterfeit Products for sale on Defendants' websites are sponsored or endorsed by Plaintiffs. And in the absence of a preliminary injunction order, upon expiration of the TRO, Defendants can and likely will move any assets from U.S.-based bank accounts—including PayPal accounts—and take other steps to evade enforcement, such as redirecting traffic to other websites they control.

Courts have authorized injunctive relief in similar cases involving infringement.[6] So under Rule 65(a) of the Federal Rules of Civil Procedure, Plaintiffs respectfully move for a preliminary injunction to prevent further immediate and irreparable injury, loss, or damage that will result to Plaintiffs if the TRO expires before Plaintiffs have an opportunity to argue before the Court in favor of entry a preliminary injunction, before any Defendants have an opportunity to be heard in opposition, and before the Court, in its discretion, can enter the injunctive relief Plaintiffs request. At bottom, a preliminary injunction would continue to stop Defendants from benefiting from their wrongful use of the TRUMP Trademarks and preserve the status quo during the pendency of this action.

### b. Preventing fraudulent transfer is appropriate

Under Federal Rule of Civil Procedure 65(d)(2)(C), this Court has the power to bind any third parties, such as domain name registries and financial institutions, who are in active concert with the Defendants or who aid and

---

[6] *See, e.g.*, *Apple Corps v. Individuals*, No. 20-60982-CIV-DIMITROULEAS, 2020 U.S. Dist. LEXIS 141919 (S.D. Fla. May 21, 2020) (granting *ex parte* application for TRO); *Gucci Am. v. Individuals*, No. 20-60397-CIV-DIMITROULEAS, 2020 U.S. Dist. LEXIS 109004 (S.D. Fla. Feb. 25, 2020) (same); *Chanel, Inc. v. Individuals, P'ships & Unincorporated Ass'ns, Case No. 21-cv-62335-WPD* (S.D. Fla. Nov. 16, 2021) (same); *Chanel, Inc. v. Individuals, P'ships & Unincorporated Ass'ns, Case No. 21-cv-62034-WPD* (S.D. Fla. Sept. 30, 2021) (same); *Awareness Ave. Jewelry LLC et al. v. The Partnerships and Unincorporated Associations identified on Schedule "A,"* Case No. 8:23-cv-00002 (M.D. Fla. Jan 18, 2023) (same).

abet Defendants and are given actual notice of the order. Indeed, it has already done so. *See* TRO, pp. 8–11.

Plaintiffs request continued restraint of Defendants' assets so that Plaintiffs' right to an equitable accounting of Defendants' profits from sales of Counterfeit Products is not impaired. Without this restraint, Defendants are likely to fraudulently transfer financial assets overseas when the TRO expires. It appears that the Defendants hold most of their assets in East Asia— making it easy to conceal assets—which will render an accounting by Plaintiffs meaningless.

Courts have the inherent authority to grant this precise relief when a plaintiff's complaint seeks relief in equity. *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 987 (11th Cir. 1995).[7] Plaintiffs seek such relief here, (*see* Complaint, pp. 26–29), and have demonstrated above that they will likely succeed on the merits of their claims. As a result, Plaintiffs will be entitled to an accounting and payment of the profits earned by Defendants throughout the course of their counterfeiting and infringement scheme. 15 U.S.C. § 1117(a). Thus, this Court has the inherent equitable authority to grant Plaintiffs' request for a continued restraint of Defendants' assets. *See*

---

[7] *See also Animale Grp. Inc. v. Sunny's Perfume Inc.*, 256 F. App'x 707, 709 (5th Cir. 2007); *Reebok Int'l Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 559 (9th Cir. 1992).

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger USA, Inc.*, 80 F.3d 749 (2d Cir. 1996).[8]

For example, courts have ordered asset restraints due to the illicit nature of the infringement and counterfeiting business and the ability of counterfeiters to practically eliminate their evidentiary trails by conducting their business entirely over the internet. *See, e.g., Levi Strauss & Co. v. Sunrise Int'l Trading*, 51 F.3d 982 (11th Cir. 1995); *Reebok Int'l Ltd. v. Marnatech Enter.*, 737 F. Supp. 1515 (S.D. Cal. 1989). In *Levi Strauss*, the Eleventh Circuit upheld an order granting an asset restraint against an alleged counterfeiter where the complaint included a request for a permanent injunction and the equitable remedy of disgorgement of the alleged counterfeiter's profits under 15 U.S.C. § 1117. *Levi Strauss*, 51 F.3d at 987. The Court emphasized the necessity of the restraint holding that a "request for equitable relief invokes the district court's inherent equitable powers to order preliminary relief, including an asset freeze, in order to assure the availability of permanent relief." *Id.*

Plaintiffs have shown a likelihood of success on the merits, an immediate and irreparable harm suffered as a result of Defendants' activities,

---

[8] S*ee also SEC v. ETS Payphones*, 408 F.3d 727, 735 (11th Cir. 2005) (finding it proper to freeze all of the defendant's assets because it was necessary to preserve sufficient funds for the potential disgorgement in the case).

and that—unless Defendants' assets remain frozen—Defendants will likely hide or move their ill-gotten funds to offshore bank accounts. The grant of an injunction preventing the transfer of Defendants' assets is thus proper.

## CONCLUSION

For all these reasons, Plaintiffs respectfully request this Court schedule a hearing on Plaintiffs' Motion for Preliminary Injunction before the expiration of the TRO on August 28, 2025,[9] and, upon the conclusion of the hearing, in the Court's discretion upon hearing oral argument from Plaintiffs and any appearing Defendants, enter a preliminary injunction order as to the Defendants identified on Schedule A[10] to Plaintiffs' Complaint.

\*      \*      \*

### Local Rule 3.01(g) Certification

Plaintiffs' counsel has not conferred with counsel for Defendants regarding this Motion as Plaintiffs are requesting preliminary injunctive relief.

### Fed. R. Civ. P. 65(a)(1) and Local Rule 6.02(b) Certification

Plaintiffs' counsel certifies that as of this 22nd day of August, 2025, Defendants are being provided notice of this Motion under the methods of

---

[9] Alternatively, Plaintiffs respectfully request this Court extend the TRO to remain in place until a hearing can be held on Plaintiffs' Motion for Preliminary Injunction.

[10] Should Plaintiffs dismiss any Defendants before the hearing to be scheduled on Plaintiffs' Motion for Preliminary Injunction, Plaintiffs are prepared to request leave to file an Amended Schedule A to Plaintiffs' Complaint.

service authorized in the Court's *Ex Parte* Order granting Plaintiffs' Motion for

Alternate Service (Doc. 20).

Dated: August 22, 2025       Respectfully submitted,

By:   */s/ Jason Hilborn*

Katie Kavanaugh       Jason Hilborn (FBN 1008829)
(*pro hac vice*)       **BOIES SCHILLER FLEXNER LLP**
**BOIES SCHILLER FLEXNER LLP**       401 East Las Olas Blvd.
2029 Century Park East, 1520       Suite 1200
Los Angeles, CA 90067       Fort Lauderdale, FL 33301
Telephone: (213) 629-9040       Telephone: (954) 356-0011
kkavanaugh@bsfllp.com       jhilborn@bsfllp.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on this 22nd day of August, 2025, a true and correct copy of

the foregoing, including exhibits, was filed with the Court's CM/ECF system.

By:   */s/ Jason Hilborn*

Jason Hilborn (FBN 1008829)
**BOIES SCHILLER FLEXNER LLP**
401 East Las Olas Blvd,
Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
jhilborn@bsfllp.com